UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANINE SOUTHER,

    Plaintiff,                                       Civil Action No. 11-CV-13966

vs.                                              HON. BERNARD A. FRIEDMAN

POSEN CONSTRUCTION, INC. and
RICK MINARD,

    Defendants.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is presently before the court on defendants' motion for summary judgment [docket entry 38]. Plaintiff has filed a response in opposition and defendants have filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the court shall decide this motion on the briefs.

This is an employment discrimination case. Plaintiff Janine Souther did construction work for defendant Posen Construction, Inc. ("Posen") under the supervision of defendant Rick Minard from April to May 2009 and from March to September 2010. While working at Posen, and before, plaintiff and Minard had an ongoing sexual relationship. Plaintiff alleges she "believed that if she did not comply with Defendant Minard['s] desires, she would lose her job." Comp. ¶ 18. In September 2010 plaintiff was laid off and a male worker allegedly took over plaintiff's job. *See id.* ¶¶ 21, 23-25.

Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964 and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") for gender discrimination (Counts 1 and 5) based on the allegation that she was discharged without cause and replaced by an "unqualified male." Compl. ¶¶ 40, 73. She also asserts claims under these statutes for quid pro quo sexual

harassment and sexually hostile work environment (Counts 2, 3, 6 and 7) based on the allegations that Minard subjected her to "unwelcome sexual conduct and communication" and that Posen failed to investigate or take corrective action. *Id.* ¶¶ 44, 47, 57, 77, 80, 90. Plaintiff also asserts claims, based on the same allegations, for "intentional emotional distress" (Counts 4 and 8). She seeks damages, costs, interest, attorney fees, back pay and unspecified equitable relief.

While defendants seek summary judgment on various grounds, the court finds the following arguments persuasive and dispositive: plaintiff's quid pro quo and sexually hostile work environment claims fail because the sexual relationship between plaintiff and Minard was consensual; plaintiff's gender discrimination claim fails because plaintiff was not replaced by a male worker; and the emotional distress claim fails because defendants did not engage in any extreme or outrageous conduct.

*Summary Judgment Standard*

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See Anderson,* 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact

exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990).

*Plaintiff's Sexual Harassment Claims*

As noted above, plaintiff claims that defendants violated her rights under Title VII and ELCRA by Minard conditioning her employment with Posen on her willingness to comply with his demands for sex and for discharging her when Minard was "through with her." This, according to plaintiff, resulted in her being subjected both to quid pro quo sexual harassment and to a sexually hostile work environment.

The Sixth Circuit has explained the applicable legal standards under Title VII as follows:

> Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). This prohibition encompasses two types of sexual harassment. First, it forbids *quid pro quo* harassment, which occurs when an employee's submission to unwanted sexual advances becomes either a condition for the receipt of job benefits, or the means to avoid an adverse employment action. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir.2000). Title VII also "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult," and, to enforce this right, prohibits conduct that creates a "hostile environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).
>
> \* \* \*
>
> When a sexual harassment plaintiff experiences a "tangible employment action," a plaintiff may prevail in a claim against the employer upon proof of the following:

3

> 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was on the basis of sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability.
>
> \* \* \*
>
> . . . To prevail on [a claim for sexually hostile work environment] Plaintiff must first establish a prima facie case. *See Clark v. UPS*, 400 F.3d 341, 347 (6th Cir.2005). Specifically, Plaintiff must show that: "(1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and that (5) the employer is vicariously liable." *Id.* (formatting altered).
>
> "For any sexual harassment preceding [an] employment decision to be actionable, ... the conduct must be severe or pervasive." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

*Howington v. Quality Rest. Concepts, LLC*, 298 F.App'x 436, 440-41, 443 (6th Cir. 2008) (footnote omitted). The standards under ELCRA are essentially the same. As the Michigan Supreme Court has explained:

> . . . Through the Civil Rights Act, Michigan law recognizes that, in employment, freedom from discrimination because of sex is a civil right. MCL 37.2102; MSA 3.548(102). Employers are prohibited from violating this right, M.C.L. § 37.2202; MSA 3.548(202), and discrimination because of sex includes sexual harassment, M.C.L. § 37.2103(I); MSA 3.548(103)(I). In turn, "sexual harassment" is specifically defined to include
>
>> unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>> (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain

>employment....
>(ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment....
>(iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment.... [MCL 37.2103(I) ; MSA 3.548(103)(I).]

The statute expressly addresses an employer's vicarious liability for sexual harassment committed by its employees by defining "employer" to include both the employer *and* the employer's agents. MCL 37.2201(a); MSA 3.548(201)(a).

Sexual harassment that falls into one of the first two of these subsections is commonly labeled quid pro quo harassment. *Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 708, 545 N.W.2d 596 (1996). Sexual harassment that falls into the third subsection is commonly labeled hostile environment harassment. *Radtke, supra* at 381, 501 N.W.2d 155. We have previously identified the elements that a party must establish in order to make out a claim for sexual harassment with respect to each of these categories.

In order to establish a claim of quid pro quo harassment, an employee must, by a preponderance of the evidence, demonstrate:

>(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment. [*Champion*, *supra* at 708-709, 545 N.W.2d 596.]

In order to establish a claim of hostile environment harassment, an employee must prove the following elements by a preponderance of the evidence:

>(1) the employee belonged to a protected group;
>(2) the employee was subjected to communication or conduct on the basis of sex;
>(3) the employee was subjected to unwelcome sexual conduct or communication;
>(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or

5

>offensive work environment; and
>(5) respondeat superior. [*Radtke, supra* at 382-383, 501 N.W.2d 155.]

*Chambers v. Trettco, Inc.*, 463 Mich. 297, 309-11 (2000) (footnotes omitted; ellipses and emphasis in original).

From this recitation of the law, it is apparent that an essential element of plaintiff's prima facie case for sexual harassment, whether for quid pro quo harassment or sexually hostile work environment, and whether under Title VII or ELCRA, is that the harassment at issue, whether in the form of advances, requests, conduct or communication, be *unwelcome*. In the present case, no reasonable jury could find in plaintiff's favor on this issue. Plaintiff testified that her sexual relationship with Minard lasted for five years "[o]n and off." Pl.'s Dep. at 9, 11.[1] Plaintiff indicated she is related to Minard by marriage; plaintiff and Minard's wife are cousins. *See id.* at 10. Plaintiff characterized her relationship with Minard as an "affair" and as a "five-year relationship with a married man." *Id.* at 89, 109. During this five-year period, plaintiff was not sexually involved with anyone other than Minard. *See id.* at 11. When Minard ended the relationship, plaintiff was "sad and angry" because "I didn't have a job anymore. *And I had lost him*." *Id.* at 112 (emphasis added).

Plaintiff's and Minard's sexual relationship began in 2005, shortly after Minard helped plaintiff to obtain a job at a construction firm named John Carlo, where Minard was working as a supervisor. *See id.* at 10-11; Minard Dep. at 34. Minard invited plaintiff for dinner and drinks and afterwards the two slept together at a hotel. *See* Pl.'s Dep. at 22. Plaintiff testified she did not

---

[1] Minard testified that his sexual relationship with plaintiff lasted from May 2005 until October 2010. Minard Dep. at 82-83. He also indicated that he and plaintiff have known each other since 1977, that plaintiff would "tag along" when Minard and his wife were dating, and that plaintiff "stood up as a bridesmaid in my wedding." *Id.* at 35, 38-39, 76.

want to have sex with Minard but did so because "I wanted to keep my job." *Id.* at 22-23. However, plaintiff could not explain why she felt her job hung in the balance, and she conceded that Minard did not say anything, directly or indirectly, that caused her to feel this way. *See id.* at 23. Nor did plaintiff complain to Minard's supervisor or to her union. *See id.* at 23-24. While working with Minard at John Carlo, plaintiff went with him on an overnight canoe trip, just the two of them. *See id.* at 25-26. Plaintiff could not recall whether she and Minard had sex on that occasion, but she did not feel coerced into going on the trip. *See id.* at 26. Plaintiff was laid off at the end of the construction season and she did not believe her sexual relationship with Minard had anything to do with her job ending. *See id.* at 30, 33-34. Minard never said or implied that plaintiff's job security depended on her having sex with him. *See id.* at 35.

Plaintiff testified that after she was laid off from John Carlo but before she started working for Posen approximately one year later, she and Minard were not sexually involved but they "were friends." *Id.* at 36-37. During this time, plaintiff and Minard had "[s]ome communications"; plaintiff could not remember if she initiated any contact during this time. *See id.* at 38-40. Nor, upon further questioning, could she remember if she and Minard had sex or dinner or drinks or lunch. *See id.* at 40. Nonetheless, inexplicably, if plaintiff did have lunch with Minard she felt coerced because "Rick has a way about him. He gets what he wants." *Id.* at 41. Plaintiff further indicated that she felt coerced because "[h]e was the initiator" and for no other reason. *Id.* at 45.

From April to May 2009 plaintiff worked for Posen in Toledo as a "truck coordinator." *Id.* at 61. Minard was working at the time as a supervisor for Posen and he got plaintiff this job. *See id.* at 62. During this month plaintiff and Minard lived together and were sexually involved. *See id.* at 62-63. Plaintiff's job ended when Minard was transferred. *See id.* at

7

63. Plaintiff did not ask Posen to let her continue doing this job, after Minard was transferred, because she "wanted to go back home." *Id.* at 63-64.

In March 2010 plaintiff came to work for Posen a second time. *See id.* at 64. Between her first and second stints with Posen, plaintiff could not recall whether she and Minard communicated, or whether Minard gave her any money, or whether she was employed, but she did recall that they did not have sex. *See id.* at 64-65. In March 2010 Minard was working for Posen as a supervisor and he suggested that plaintiff apply for an "OJT, operating heavy equipment job." *Id.* at 38, 64. Minard did not promise to hire plaintiff in exchange for sex. *See id.* at 41. Within one week of plaintiff starting work at Posen, she and Minard recommenced their sexual relationship. *See id.* at 49. They went to dinner and spent the night in a hotel. *See id.* Minard said nothing and implied nothing conditioning her job security on her acquiescence. *See id.* So long as plaintiff worked for Posen, she and Minard had sex weekly. *See id.* at 49-50.

Plaintiff testified that Minard "treated me differently . . . pretty much the month of August" 2010 and that she knew the relationship was over. *Id.* at 79, 81. She had sex with Minard, at her house, for the last time on Labor Day in 2010. *See id.* at 78. Two days later Minard told plaintiff she was being laid off that day. *See id.* at 80. Minard told plaintiff the reason for the layoff was "[t]hat the work on Fort Street was slowing down," although plaintiff thought the reason was that he wanted to end his sexual relationship with her. *Id.* at 81, 84. Minard called plaintiff on October 10, 2010, and told her the relationship was over. *See id.* at 97. Plaintiff threatened Minard via text message that "[m]aybe your wife would like to know what's been going on" because plaintiff was "[a]ngry and upset. I didn't have my job." *Id.* at 28.

Plaintiff testified that Minard gave her money "[i]f I asked for it," although she had

8

"no idea" if he ever asked to be repaid. *Id.* at 9. He once helped plaintiff "pay for a lawyer's fee for my son." *Id.* Plaintiff had "no idea" how much money Minard gave her over the years, but she indicated it was more than $1,000. *Id.* at 27.[2] Plaintiff also indicated that during the year before she began working at Posen, Minard came to her house to do home repairs such as laying tile and that plaintiff agreed to let him do so. *See id.* at 41-42.[3] Plaintiff gave Minard the password to her email account so that he could help her with her job search by sending her resume. *See id.* at 75.

Plaintiff recalled one occasion when Minard was working in Lansing, during a time when plaintiff was not working for Posen, and she drove there to visit him at his invitation. *See id.* at 67, 94-95.

Plaintiff never told anyone at Posen about her relationship with Minard until November 2010 when she asked Debbie Springer[4] in the HR department "if I was not being called back to work because Rick had ended his affair with me?" *Id.* at 29, 89. Minard also kept the relationship secret. *See* Minard Dep. at 107-108. Springer directed plaintiff to put her name on the "out-of-work list." Pl.'s Dep. at 89. Plaintiff's "comment" to Springer was her only communication with Posen regarding her relationship with Minard. *Id.* at 101-102.

Plaintiff testified that in the first week of October 2010 she asked Minard to put her

---

[2] Minard testified that he did not keep track of the money, some of which he considered gifts and some of which he considered loans, but he estimated the amount to be "two, $3,000.00, minimum" from 2005 to 2010. Minard Dep. at 131-32.

[3] Minard testified that in 2008 he did various home improvement projects for plaintiff in order to help her sell her house; he "[r]eplum[b]ed the bathroom, fixed up after water pipes froze, . . . installed tiles, ceramic shower." Minard Dep. at 133-34.

[4] Debra Springer testified that she works (and in November 2010 was working) for Posen as an "[o]ffice HR assistant." Springer Dep. at 10. She confirmed that plaintiff "wanted to know if I knew that she was having an affair with Rick Minard." *Id.* at 19. Springer "didn't consider that a sexual harassment [claim] when she told me she was having an affair." *Id.* at 35.

back to work, to which he responded that no work was available at the Fort Street project from which she had been laid off. *See id.* at 87-88. Plaintiff believes this was untrue because another worker employed on that project, Scotty Noble, told plaintiff later in October that he was operating the loader which plaintiff had been operating prior to being laid off.[5] *See id.* at 86-87. Noble is the "unqualified male" who allegedly replaced plaintiff, referenced in plaintiff's EEOC complaint, although plaintiff testified she believes that he in fact is qualified to operate equipment. *See id.* at 99.

From her own deposition testimony, it is abundantly clear that the sexual relationship between plaintiff and Minard was not "unwelcome." No reasonable juror presented with plaintiff's testimony could conclude otherwise. Plaintiff and Minard have known each other for many years and are related by marriage. Plaintiff indicated that she and Minard were sexually intimate on a regular basis during a five-year period from 2005 to 2010 during three stints of employment with two different employers. They had sex weekly at various locations, including hotels, plaintiff's house, and Minard's house. During this time plaintiff was sexually active with Minard exclusively, and at one point she and Minard lived together for at least a month. Even when they were not sexually active, they remained friends. Minard gave plaintiff money, loaned her money, helped with her resume, and did home improvement projects for her. Plaintiff gave Minard the password to her email account and he had a key to her house, although plaintiff denies having given it to him. Plaintiff never complained to anyone at John Carlo or Posen about Minard's alleged harassment, but instead characterized the relationship as an "affair" and as a "five-year relationship with a married

---

[5] Minard testified that plaintiff was not called back to the Fort Street project because her work at that project was completed and that no other workers operated a loader (the only piece of equipment plaintiff operated at that project) after mid-September 2010. *See* Minard Dep. at 106.

10

man" and testified that she was sad when he ended the relationship because she "had lost him." Plaintiff concedes that Minard never offered to hire her in exchange for sex and that he never conditioned her continued employment on her acquiescence to any demands. Nor has she offered any evidence suggesting that Minard or anyone else ever did or said anything to create a hostile work environment. There being no evidence of *unwelcome* advances, requests, conduct or communication, no prima facie case of sexual harassment has been stated.[6] Defendants are entitled to summary judgment on these claims.

*Plaintiff's Gender Discrimination Claims*

As noted above, plaintiff also asserts claims under Title VII and ELCRA for gender discrimination based on the allegation that she was discharged without cause and replaced by an "unqualified male." The standards governing gender discrimination claims under Title VII have been summarized as follows:

> In Title VII actions, "a plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997). When using circumstantial evidence to create an inference of discrimination, the complainant must carry the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination by his or her employer. In evaluating a claim of employment discrimination, we employ the

---

[6] Nor has plaintiff offered any evidence to support her allegation that Minard laid her off because he was "done having desiring [sic] sex with" her. Pl.'s Br. at 9. First, there is no logical connection between the end of the sexual relationship and the end of plaintiff's employment. The case would look much different if plaintiff had been the one to end the relationship and was then promptly laid off, but as plaintiff testified it was Minard, not she, who ended it. There is no quid pro quo harassment or hostile work environment in these circumstances. *See Howington, supra.*

> burden-shifting approach first announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir.2002); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A plaintiff who successfully establishes a prima facie case receives the benefit of a presumption that the employer unlawfully discriminated against him. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. The burden then "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " *Id.* at 253, 101 S.Ct. 1089 (quoting *McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817). Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* Throughout this shifting burdens framework applicable when circumstantial evidence is involved, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*; *see also Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir.1995).
>
> \* \* \*
>
> . . . A plaintiff who . . . wishes to prove a prima facie case through the use of circumstantial evidence must prove four elements: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Talley*, 61 F.3d at 1246.

*DiCarlo v. Potter*, 358 F.3d 408, 414-15 (6th Cir. 2004). "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

In the present case, plaintiff has failed to state a prima facie case of gender discrimination because she has not shown she was replaced by a man or treated differently than similarly situated male workers. Plaintiff's only evidence that she was replaced is her deposition

12

testimony that David "Scotty" Noble, a fellow worker from the Fort Street project, told her that he operated a loader at that project after plaintiff was laid off. *See* Pl.'s Dep. at 87. Plaintiff's testimony about what Noble said is hearsay. Noble testified that he is a "laborer and a grade checker," that he has never operated a loader, that he is not trained to operate a loader, and that he never told plaintiff that he operated a loader at the Fort Street project. Noble Dep. at 10-12, 17. On this record, plaintiff has no evidence that she was replaced or treated differently than similarly situated male employees.[7] Defendants are entitled to summary judgment on this claim.

*Emotional Distress Claims*

Finally, plaintiff claims that defendants intentionally subjected her to emotional distress. *See* Compl. ¶¶ 61-64, 94-97. Plaintiff points to Minard's "intimate contacts" with her, the fact that she was laid off and "replace[d] . . . with a man, Minard's "threatening text messages," and Posen's "failure to take any action." *Id.*

> "To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh*, 263 Mich.App. at 634, 689 N.W.2d 506. "[O]nly when a plaintiff can demonstrate that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community' " will liability attach. *Id., quoting Graham v. Ford*, 237 Mich.App. 670,

---

[7] While there is evidence from other witnesses that two male equipment operators worked at the Fort Street project after plaintiff was laid off, they were not similarly situated because they were trained to operate other equipment, such as excavators, in addition to loaders, whereas plaintiff was a loader operator trainee. *See* Cook Dep. at 36-37; Cook Decl. ¶¶ 4-5. The undisputed testimony is that plaintiff's work was finished at the time she was laid off. *See* Minard Dep. at 103; Cook Decl. ¶ 5.

13

> 674, 604 N.W.2d 713 (1999). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not give rise to liability for intentional infliction of emotional distress. *Doe*, 212 Mich.App. at 91, 536 N.W.2d 824. Initially, the trial court must determine whether a defendant's conduct qualifies as so extreme and outrageous as to permit recovery for intentional infliction of emotional distress. *Sawabini v. Desenberg*, 143 Mich.App. 373, 383, 372 N.W.2d 559 (1985).

*Dalley v. Dykema Gossett*, 287 Mich. App. 296, 321 (2010). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" *Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993). Further, "[i]n assessing whether the alleged conduct is sufficiently extreme and outrageous, we are to look to the context of the alleged conduct, to the totality of the circumstances. *Id.*

In the present case, plaintiff has presented no evidence to support any of the elements of this tort. She has identified no "extreme and outrageous conduct" by either Minard or Posen. As discussed above, all of the "intimate contacts" between plaintiff and Minard were consensual. This being the case, Posen (from whom both plaintiff and Minard had concealed the affair) had no duty to take any action. Being laid off is not extreme or outrageous, but an everyday occurrence for which, under circumstances not present in this case, the employee may have legal remedies other than a tort claim for emotional distress. Further, as discussed above, plaintiff was not "replaced with a man." If she had been replaced by a man, and if her work on the project had not been completed, and if the man were similarly situated, then plaintiff may have a remedy under the civil rights laws, but the replacement itself is not extreme and outrageous.

The text message allegation also falls short of identifying anything close to extreme and outrageous conduct. While the complaint alleges that Minard sent plaintiff "threatening

14

messages," plural, the record contains evidence of only one such message. Plaintiff testified that in October 2011, after she had been laid off, she texted Minard that "[m]aybe your wife would like to know what's been going on." Pl.'s Dep. at 28. Minard testified that he responded to this threat by texting plaintiff that "you want to go there, you can start sleeping with one eye open." Minard Dep. at 116. Minard's message does not begin to qualify as extreme and outrageous. At worst, it is a silly "tit for tat" in response to plaintiff's threat to expose the affair.

Nor has plaintiff offered any evidence of intent/recklessness, causation or severe emotional distress. In response to defendants' motion, plaintiff's attorneys assert that plaintiff's termination "caused severe mental anguish whereby it was necessary for Ms. Souther to seek the assistance of multiple medical professionals." Pl.'s Br. at 19. However, plaintiff has provided no supporting testimony on this issue, except to say that she saw a counselor once, *see id.* at 111, and she has submitted no medical evidence of any kind. In short, plaintiff has neither stated nor made out a claim for intentional infliction of emotional distress.

*Conclusion*

For the reasons stated above, the court concludes that plaintiff's sexual harassment claims fail because Minard's conduct toward her was not unwelcome, that plaintiff's gender discrimination claims fail because plaintiff has no evidence she was replaced by a similarly situated male worker, and plaintiff's emotional distress claims fail because she has not shown that defendants engaged in any extreme or outrageous conduct or that she suffered any emotional distress. Accordingly,

IT IS ORDERED that plaintiff's motion [docket entry 42] for leave to amend her response to defendants' motion for summary judgment is granted.

IT IS ORDERED that defendants' motion [docket entry 38] for summary judgment is granted.

                                                        S/Bernard A. Friedman_____
                                                        BERNARD A. FRIEDMAN
                                                        SENIOR UNITED STATES DISTRICT JUDGE

Dated: August 29, 2012
       Detroit, Michigan